Roger W. KERNDT, Appellee,

v.

**ROLLING HILLS NATIONAL BANK and Darryl D. Smith, Appellants.**

No. 95–1468.

Supreme Court of Iowa.

Jan. 22, 1997.

---

Patrick J. Barrett and Ronald L. Comes of McGrath, North, Mullin & Kratz, P.C., Oma-ha, and James Mailander, Anita, for appellants.

Jaki K. Samuelson and Jason M. Casini of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and TERNUS, JJ.

McGIVERIN, Chief Justice.

We must determine whether the district court properly awarded plaintiff Roger W. Kerndt $14,000.00 in damages in his breach-of-contract action against defendant Rolling Hills National Bank, Kerndt's former employer. We must also decide whether the court erred in denying Kerndt's motions challenging the adequacy of the damages awarded and in failing to determine that certain statements made by another defendant, the chairman of the bank's board, constituted per se defamation. We affirm in part, reverse in part, and remand for entry of an additur or new trial on the issue of damages.

I. *Background facts and proceedings.* The present controversy arises from plaintiff Roger Kerndt's dismissal as president of defendant Rolling Hills National Bank in Atlantic, Iowa. The bank, a national banking corporation, hired Kerndt in January 1991 to serve as its president and chief executive officer, after examiners for the federal Office of the Comptroller of the Currency (OCC) found problems with the bank's credit procedures and general financial condition. In March 1991 the parties signed a written employment agreement for a one-year term. In September 1991 the parties signed a restatement of employment agreement which replaced the earlier employment agreement and established a term of employment for Kerndt until December 31, 1994. Both documents were prepared by the bank and its attorneys. The restatement of employment agreement provided in relevant part:

2. *COMPENSATION:* As consideration for his services to be rendered under this Agreement and for his agreement to and compliance with the terms of this Agreement, BANK shall pay KERNDT a mini-

mum annual salary of $60,000 plus an annual performance bonus based upon the degree of compliance with the twenty-five (25) "Standards of Performance" outlined below:

. . . .

4. *TERMINATION OF EMPLOYMENT*: KERNDT'S employment hereunder shall terminate upon the occurrence of the earlier of the following events:

(a) December 31, 1994 (unless extended by formal agreement of the parties hereto). If the agreement is not officially extended, this Agreement shall automatically be extended for one (1) year periods, thereafter.

(b) Dismissal of KERNDT for cause. "Cause" shall mean: (i) willfully and persistently refusing to perform the duties and instructions reasonably imposed or given to KERNDT, by BANK, (ii) engaging in any activity that is substantially injurious to the financial interests of the BANK; (iii) being convicted of a crime involving moral turpitude, or (iv) otherwise violating the terms and conditions of this Agreement.

(c) Death of KERNDT.

(d) Disability of KERNDT. For purposes of this Agreement, "Disability" shall mean the inability of KERNDT to substantially perform all of his duties hereunder for a continuous period of three (3) months.

*If KERNDT'S employment is terminated in accordance with the above, no further payments under Paragraph 2 above shall be made subsequent to termination* specifically including the annual performance bonus which shall not be prorated.

(Emphasis added.)

For several months beginning in March 1991, plaintiff Kerndt received treatment for a condition known as "panic disorder" and was absent from work for short periods of time. Kerndt told the bank's board of directors and other persons about his condition, and the bank did not impose any disciplinary measures because of the absences. Kerndt recovered from the disorder by June 1991.

The bank's financial condition improved during Kerndt's tenure as president. In its June 1992 evaluation of the bank, the OCC found that the bank's organization was stronger and the number of high-risk loans had decreased. Although Kerndt did not receive a bonus for 1991, the board of directors increased his salary by $2,500. In December 1992 the board gave Kerndt a $10,250 bonus and a $2,500 raise in salary.

Despite the bank's improved financial situation, plaintiff Kerndt's relations with the board of directors and bank employees were becoming strained. The board's 1992 review of Kerndt's performance noted that he criticized individual board members to other board members. In a conversation with defendant Darryl Smith, the board's chairman, Kerndt referred to the board as "a pathetic lot" and "a bunch of idiots." While Kerndt was president of the bank, a number of employees resigned or were dismissed, and several others indicated that they wanted to quit their jobs because of a stressful working environment.

In late December 1992 an employee told board chairman Smith that a number of employees planned to resign because of antagonisms with Kerndt and that Kerndt had threatened employees with dismissal if they spoke to board members about their concerns. The board held a special meeting on December 29, 1992 to discuss those problems and to consider its recent performance review of Kerndt. The board noted that Kerndt "had gotten the bank back on track" but expressed dissatisfaction with his handling of personnel matters. It directed Kerndt to improve communication with bank employees, take the blame for his own mistakes, stop dwelling on mistakes made by others, and conduct employee reviews. The board further directed Kerndt to hold a meeting with bank employees the next morning, December 30, in order to start remedying the situation. Kerndt did not call such a meeting the next day, although he did meet with three employees on December 31.

On January 6, 1993, the bank's board of directors voted to dismiss Kerndt, citing his failure to meet with all the bank's employees and to take the blame for poor relations with the board of directors and the employees. On January 15, 1993, board chairman Smith

sent Kerndt a written notice of termination advising that Kerndt would be paid for his services through that date. The written notice asserted that Kerndt had disregarded specific board directives, allowed a breakdown in employee relations to occur, was unable to work effectively with his staff, had an adverse relationship with the board, and failed to devote his full time and attention to the bank's business.

Board chairman Smith discussed the bank's personnel problems with persons other than Kerndt, the members of the board of directors, and bank employees. Shortly before Kerndt's dismissal, Smith contacted Garland Carver, a banking consultant who had assisted Kerndt in obtaining employment with the bank, and told him that Kerndt had not been functioning for six months, Kerndt had been having mood swings, and nobody trusted Kerndt. Smith also told Carver that doctors on the board of directors were concerned about Kerndt's mental health. After the board of directors voted to dismiss Kerndt, Smith again contacted Carver and told him that someone should persuade Kerndt to resign from the bank. During the same time period, Smith called Stephen McGill, a former loan officer at the bank, to tell him Smith was concerned about Kerndt's mental health.

In March 1993 Kerndt filed a petition in district court. *See* Iowa R. Civ. P. 48. Count I alleged a breach by the bank of the parties' employment agreement, and Count II alleged defamation of Kerndt by the bank and board chairman Smith.

The defendant bank and defendant Smith filed a motion for summary judgment, *see* Iowa R. Civ. P. 237, contending that the National Bank Act, 12 U.S.C. § 24 (1989), precluded Kerndt's breach-of-contract action and, alternatively, that the bank dismissed Kerndt for cause under the employment agreement. Defendants further urged that Smith's statements to Carver and McGill were not defamatory and, alternatively, that the statements were true and/or privileged.

The district court denied defendants' motion for summary judgment, concluding that: (1) 12 U.S.C. § 24 does not preclude a breach-of-contract action based on compensa-tion provisions, and there was a factual issue as to whether Kerndt was dismissed for cause; and (2) there was a genuine issue of material fact as to whether Smith's statements constituted slander, and the defenses of truth and privilege did not apply.

The case proceeded to a trial by jury. The trial court overruled defendants' motion for directed verdict concerning submissibility of the breach-of-contract issue to the jury, plaintiff's motion for directed verdict on the defamation issue, and impliedly precluded defendants' defenses of truth and privilege on the defamation issue by declining to instruct the jury on those defenses. The jury returned a verdict for plaintiff Kerndt on his breach-of-contract claim, awarding him damages of $14,000, and found for the defendants on the defamation claim. The trial court overruled Kerndt's post-trial motions for additur or new trial on the issue of contract damages and for judgment notwithstanding the verdict or new trial on the defamation issue.

The bank and Smith appeal, arguing that the National Bank Act, 21 U.S.C. § 24, renders the entire employment agreement between the bank and Kerndt unenforceable. Alternatively, defendants argue that there was cause under the agreement for the bank's dismissal of Kerndt. Kerndt cross-appeals, contending that the amount of contract damages awarded by the jury was inadequate and that the trial court should have ruled as a matter of law that Smith's statements to Carver and McGill constituted per se defamation, leaving only the issue of defamation damages for decision by the jury.

■ II. *Standard of review.* Our review in this law action is for correction of errors at law. Iowa R.App. P. 4. We are bound by the findings of fact in a law action if they are supported by substantial evidence. Iowa R.App. P. 14(f)(1). We review the trial court's ruling on a challenge to the adequacy of a damage award for an abuse of discretion. *Witte v. Vogt,* 443 N.W.2d 715, 716 (Iowa 1989).

III. *Kerndt's breach-of-contract claim.* In overruling the motion for summary judgment filed by defendants bank and board

chairman Smith, the district court determined that the National Bank Act did not preclude plaintiff Kerndt's breach-of-contract claim, because the claim sought to enforce reasonable terms of the employment contract rather than to challenge the bank's authority to dismiss Kerndt for any reason. The court also refused to grant summary judgment on defendants' contention that Kerndt was terminated for cause, instead leaving that issue for the jury's determination. Similarly, the court at trial overruled defendants' motion for directed verdict on the same issues. On appeal, the bank and Smith assert that the district court erred in those rulings.

The district court also denied Kerndt's post-trial motions for additur to the jury's award to Kerndt of $14,000 or for a new trial on the issue of damages. *See* Iowa R. Civ. P. 250, 244(e). On cross-appeal, Kerndt argues that the district court erred in that ruling.

We turn now to these arguments.

A. *Enforcement of provisions of employment agreement.*

1. Because Rolling Hills National Bank is a national banking association, the National Bank Act, 12 U.S.C. § 21 et seq., governs its operations. *See* 12 U.S.C. § 37. The powers given to national banks include:

Fifth. To elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, *dismiss such officers or any of them at pleasure,* and appoint others to fill their places.

12 U.S.C. § 24 (Fifth) (emphasis added).

█ The parties agree that in light of that provision, a national bank cannot be liable for wrongful termination when it dismisses an officer without cause. *See Wiskotoni v. Michigan Nat'l Bank–West,* 716 F.2d 378, 387 (6th Cir.1983) (noting that 12 U.S.C. § 24 (Fifth) "has consistently been construed by both federal and state courts as preempting state law governing employment relations between a national bank and its officers and depriving a national bank of the power to employ its officers other than at pleasure").

Indeed, 12 U.S.C. § 24 (Fifth) has the effect of changing a contract of employment to one of employment-at-will. *Patterson v. Commonwealth Nat'l Bank,* 591 So.2d 73, 74 (Ala. 1991). Thus, it appears to be without question that the bank could dismiss Kerndt at pleasure without incurring liability for wrongful discharge.

However, that conclusion does not dispose of the matter; Kerndt maintains that the National Bank Act does not preclude a claim for severance pay based on an employment agreement's compensation provisions. He argues that even though his dismissal was not a wrongful act, any reasonable compensation provisions in his employment contract are enforceable under an OCC regulation, 12 C.F.R. 7.5220, which provided at the time in question:

The board of directors of a national bank, pursuant to paragraph Fifth of 12 U.S.C. 24, may enter into employment contracts with its officers and employees upon reasonable terms and conditions.[1]

Courts interpreting the regulation in the context of contractual compensation provisions have concluded that it permits enforcement of such provisions. *See Mardula v. Rancho Dominguez Bank,* 43 Cal.App.4th 790, 51 Cal.Rptr.2d 63, 67 (1996) (finding that a severance-pay provision did not violate 12 U.S.C. § 24); *Citizens Nat'l Bank & Trust Co. v. Stockwell,* 675 So.2d 584, 586–87 (Fla. 1996) (asserting that contractual severance provisions do not undermine the National Bank Act's purpose); *Ewert v. Drexel Nat'l Bank,* 271 Ill.App.3d 1124, 208 Ill.Dec. 431, 436, 649 N.E.2d 487, 492 (1995) (holding that an officer of a national bank may contract for severance pay in a written employment agreement); *Schmidt v. Park Ave. Bank,* 147 Misc.2d 1043, 558 N.Y.S.2d 779, 780 (Sup.Ct. 1990) (determining that an agreement for severance pay did not violate the National Bank Act).

Compensation provisions of employment agreements have been upheld even where such compensation was payable only upon the officer's termination without cause. *See*

---

1. The OCC has deleted this regulation, effective April 1, 1996, because the "reasonable" standard is necessarily in effect through other provisions. 61 Fed.Reg. 4849, 4860 (1996).

*Stockwell,* 675 So.2d at 585–86; *Schmidt,* 558 N.Y.S.2d at 779–80. In *Stockwell,* the Florida court asserted that an agreement which provided for severance benefits if an officer were terminated without cause did not limit the bank's ability to fire its officers at will. *Stockwell,* 675 So.2d at 586. Noting that the bank was free to enter an employment contract without agreeing to pay severance benefits upon termination, the court held that the bank was bound by the terms it had negotiated. *Id.*

■ We believe, as plaintiff Kerndt urges, that a contractual term providing for compensation in the event of termination without cause does not violate the National Bank Act and thus is enforceable. Enforcement of a severance-pay provision does not circumscribe a national bank's authority, under 12 U.S.C. § 24 (Fifth), to dismiss an officer at pleasure. *Mardula,* 51 Cal.Rptr.2d at 67. When negotiating an employment contract, both a bank and its officers are presumed to be aware of the termination powers conferred upon national banks by the National Bank Act. *Id.* A conclusion that severance-pay provisions violate the National Bank Act would preclude severance pay for most, if not all, officers of national banks. *Id.* We do not believe the National Bank Act was designed to achieve that result, and thus we conclude that the district court did not err in determining that the Act did not preclude Kerndt's breach-of-contract claim.

■ 2. Because we conclude that the National Bank Act does not preclude an action for severance pay, the contract issue then boils down to whether the employment agreement between the bank and Kerndt provided for such compensation. Defendant bank points out that the employment agreement in this case does not contain a term expressly providing for compensation upon termination. Rather, the agreement provides only that "[i]f Kerndt's employment is terminated in accordance with [provisions setting forth reasons for termination], no further payments ... shall be made subsequent to termination specifically including the annual performance bonus which shall not be prorated."

■ We rely on the usual principles of contract construction to determine whether the employment agreement between the bank and Kerndt provided for severance compensation. In construing a written contract, the intent of the parties controls; except in cases of ambiguity, the parties' intent is determined by what the contract itself says. Iowa R.App. P. 14(f)(14). Any ambiguities in the contract are strictly construed against the drafter. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862–63 (Iowa 1991). A contract must be interpreted as a whole; an interpretation which gives a reasonable meaning to all terms is preferred to one which renders a term superfluous or of no effect. *Id.* at 863.

Applying those principles here, we believe the written employment agreement between the bank and plaintiff Kerndt provided for compensation in the event Kerndt was terminated without cause. The bank, which drafted the agreement, chose to include a provision regarding compensation in the event of termination. Although that term specifically stated only that Kerndt would not receive further compensation if he were terminated for one of four given reasons,[2] its logical corollary is that Kerndt would receive compensation if he were terminated for other than those reasons. Any other interpretation would render that provision of the contract meaningless. Thus, we conclude that the written contract between the bank and Kerndt impliedly provided for severance compensation in the event that Kerndt was terminated without cause.

■ B. *"Cause" for Kerndt's termination.* Because the jury returned a verdict in plaintiff Kerndt's favor on the breach-of-contract claim, it impliedly found that the bank terminated Kerndt without cause. The bank contends the district court erred in

---

**2.** Kerndt's employment was to terminate upon the occurrence of the earliest of the following: (a) December 31, 1994; (b) dismissal for cause; (c) death of Kerndt; or (d) disability of Kerndt.

The parties do not argue that categories a, c, or d are applicable; category b, dismissal for cause, is the only category at issue.

failing to rule as a matter of law that Kerndt was dismissed for cause. We do not agree.

The written employment contract between the bank and Kerndt defined "cause" as "willfully and persistently refusing to perform" Kerndt's reasonably assigned duties, engaging in conduct substantially injurious to the bank's financial interests, "being convicted of a crime involving moral turpitude," or otherwise violating the employment agreement. In dismissing Kerndt, the bank cited his failure to call a meeting of all bank employees and to conduct evaluations of the employees, his adverse relationship with the employees and board of directors, and his failure to devote his full time and attention to the bank's business. We believe that a genuine issue of fact existed over whether these alleged violations constituted cause for termination under the employment agreement, especially because the board of directors issued its directives to Kerndt only a few days before he was dismissed. We conclude the district court did not err in allowing the jury to determine whether cause under the terms of the employment agreement existed for Kerndt's dismissal.

C. *Adequacy of damages awarded.* Concerning contract damages, the trial court instructed the jury:

### INSTRUCTION NO. 12

The measure of damages for breach of contract is an amount that would place Roger Kerndt in as good a position as he would have enjoyed if the agreement had been fully performed.

The damages you award for breach of contract must be foreseeable or have been reasonably foreseen at the time the parties entered into the agreement.

In your consideration of the damages, you may consider the following: the amount of wages, bonuses and benefits Mr. Kerndt would have received had he been paid by Rolling Hills National Bank until December 31, 1994, less any wages, bonuses, and benefits actually earned in his subsequent employment as of December 31, 1994.

Plaintiff Kerndt argues that instead of the $14,000 it awarded on the breach-of-contract claim, the jury should have awarded a minimum of $33,229.51 in damages based on the difference between what Kerndt claimed he would have earned under his written employment agreement with the bank until the end of 1994 and what he actually earned at a different job after his termination by the bank. He therefore contends the trial court erred in denying his motions for additur or new trial, Iowa R. Civ. P. 250, 244(e), on the issue of damages on the breach of contract claim.

 An inadequate award merits a new trial as much as an excessive one. Iowa R. Civ. P. 244(d); *Witte,* 443 N.W.2d at 716. Whether the damages awarded are inadequate in a particular case depends on the facts of that case. *Witte,* 443 N.W.2d at 716. "If uncontroverted facts show the amount of the verdict bears no reasonable relationship to the loss suffered, the verdict is inadequate." *McHose v. Physician & Clinic Serv., Inc.,* 548 N.W.2d 158, 162 (Iowa App. 1996). In such a case, refusal by the district court to grant either an additur or a new trial is an abuse of discretion. *Id.* In cases involving undisputed or liquidated damages or damages reasonably susceptible to precise calculation, additur is appropriate. 58 Am. Jur.2d *New Trial* § 585, at 512 (1989).

 In this case, we believe there is no reasonable relationship between the jury's award of $14,000 in damages and the loss suffered by Kerndt. No rationale for the $14,000 amount appears in the evidence. The bank's defense was that it owed Kerndt nothing under the terms of the National Bank Act and the employment contract. The written employment agreement established the compensation to which Kerndt was entitled. Kerndt testified that under the agreement, he would have received $127,291.51 in salary for the remainder of his employment term at Rolling Hills National Bank; however, he actually earned $94,062.00 in salary at a different job during that time period. The difference is $33,229.51. That testimony was not disputed by the bank.

We conclude the district court should have denied Kerndt's motion for new trial as to contract damages only on the condition that

the bank accept an additur raising the award to Kerndt from $14,000 to $33,229.51. Accordingly, we reverse and remand on this cross-appeal issue.

IV. *Kerndt's defamation claim.* The jury found for defendants bank and board chairman Smith on plaintiff Kerndt's defamation claim, thus impliedly finding that Smith's statements to Carver and McGill were not defamatory. On cross-appeal, Kerndt challenges the trial court's denial of his motions for directed verdict, new trial, and judgment notwithstanding the verdict with regard to his defamation claim. He contends the trial court should have ruled as a matter of law that Smith's statements to Carver and McGill constituted per se defamation rather than allowing the jury to determine whether the statements were defamatory.

Defamation involves the publication of written or oral statements which tend to injure a person's reputation and good name. *Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994). The oral publication of defamatory matter constitutes slander. *Id.* A plaintiff alleging defamation ordinarily must prove that the statements at issue were made with malice, were false, and caused damage. *Jenkins v. Wal–Mart Stores, Inc.,* 910 F.Supp. 1399, 1425 (N.D.Iowa 1995). However, some statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity, or damage. *Id.* at 1425–26. In such cases, malice is presumed. *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 117 (Iowa 1984). Defamatory statements affecting a person in his or her business, trade, profession, or office fall into this category, as do attacks on a person's integrity and moral character. *Lara,* 512 N.W.2d at 785.

A statement is not defamatory per se if it is susceptible to two reasonable constructions or meanings, one not defamatory. In that case, the jury must decide if the statement is defamatory. *Vinson,* 360 N.W.2d at 116. The focus of this analysis is on the meaning of the statement or how it

will be understood by a reasonable person. In *Vinson* we stated:

> The rule is that when the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court. If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed.
>
> . . . .
>
> We believe that a statement that an employee was fired for making incorrect entries on her time card could *reasonably be taken* as imputing dishonesty to the employee. Therefore we find that Williams' statement could be *understood* as defamatory per se. The trial court did not err in allowing the jury to determine whether the defamatory *meaning was the one conveyed.*

*Vinson,* 360 N.W.2d at 116 (emphasis added).

If a statement can have two reasonable constructions, the jury may then reach one of three possible conclusions: (1) the statement was reasonably understood as defamatory per se; (2) the statement was understood as defamatory, but not defamatory per se (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) the statement was not understood as defamatory. Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner,* 44 Drake L.Rev. 639, 652 (1996).

In the present case, Smith told Carver that Kerndt had not been functioning for six months, that Smith and others on the bank's board of directors were concerned about Kerndt's mental health, that Kerndt was having mood swings, and that nobody trusted Kerndt. Smith told McGill he was concerned about Kerndt's mental health. The district court concluded these statements had at least two possible meanings. Thus, the court believed the meaning conveyed by the statements was sufficiently ambiguous to merit submission to the jury.

We agree. Although Smith's statements to Carver and McGill could be understood to mean that Kerndt's banking skills were deficient, the record contains evidence tending to

support another interpretation of Smith's statements—simply that Kerndt was going through a difficult time and needed support from his friends.

Carver testified that:

Darryl [Smith] said that they wanted to be helpful ... to Roger [Kerndt], and when our call ended he was waiting for a call from Roger telling him he had visited with all the employees. Never once did Darryl say anything bad about Roger's banking skills. I took it from our conversation that he also wanted to try and get over whatever it was ... and to be helpful to Roger.

McGill testified that he did not perceive Smith's comments to him about Kerndt as disparagement or defamation, but rather as indications of concern and compassion. The manner in which Carver and McGill understood their conversations with Smith suggests that a reasonable person could interpret Smith's statements as having a non-defamatory meaning.

We conclude that the trial court did not err in allowing the jury to determine whether Smith's statements were defamatory. The jury impliedly found that the statements were not understood as being defamatory of Kerndt.

V. *Disposition.* We have considered other arguments raised by the parties and find them to be without merit or unnecessary to discuss. We affirm the judgment of the district court in all respects, except that we reverse and remand on the issue of contract damages.

Upon remand, the district court shall order a new trial on the issue of contract damages unless defendant bank files an additur accepting the amount of $33,229.51 as plaintiff Kerndt's contract damages. In the latter event, the district court shall enter appropriate judgment for interest thereon and assess costs.

Costs on appeal shall be taxed one-half to appellant bank and one-half to appellee Kerndt.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**